Case numbers 245498, 245499, and 255017, United States of America v. Evan Herrell, United States of America v. Mark Grinkowski, and United States of America v. Mark Grinkowski, and then United States of America v. Kerry McFarlane, to be argued on briefs. Argument not to exceed 15 minutes per side for Defendants Herrell and Grinkowski, 30 minutes for plaintiff, and then case number 245664 to be submitted on briefs. Ms. Loretta Cravens, you may proceed for the appellate. Good morning, your honors. My name is Loretta Cravens. I represent Dr. Evan Herrell, one of the defendants in this case, and my office also represented him at trial along with my law partner, David Eldridge. Dr. Herrell, Dr. Grinkowski, Dr. McFarlane, and Dr. Stephen Cirelli went to trial on this case in the middle of 2023 in the Eastern District of Kentucky. These were physicians who practiced at EHC Healthcare, which had two locations in Tennessee, within the Eastern District of Tennessee, in Harriman and Jacksboro, Tennessee. The significance of Jacksboro, I hope you've all visited Tennessee, but these are small towns that generally don't get a lot of tourist attractions. Jacksboro is on the I-75 corridor, and it's just about 30-45 minutes south of the southern Kentucky border. The significance of that, obviously we have this jurisdictional prosecution issue. The Eastern District investigated, because these clinics are, if Tennessee investigated and declined prosecution, because the clinics are located in Tennessee, Kentucky, the Eastern District, took jurisdiction after their investigation based on the number of individuals who crossed that southern Kentucky border into Jacksboro to become patients at this clinic. EHC was an addiction medication-assisted treatment center where the physicians prescribed Suboxone. As you'll see from the briefs and the government's briefs, the government's theory of prosecution at trial was based on a number of what we argued were called red flags, and what the government argued as red flags about the various practices that were going on at that clinic. Dr. Harrell was the medical director at the Jacksboro Clinic. Specifically in our briefing, we have pointed to one of those red flags that I want to address with the court today, and that is also addressed extensively, frankly, in the briefing for co-defendant McFarland that's now been submitted on briefs due to some issues yesterday. And that is, at trial, the United States pointed to these red flags. Some of those were administrative, specifically something we referred to as the DATA waiver, D-A-T-A waiver, or an X waiver, or at trial was sometimes referred to as a patient cap. And that was DEA guidance that existed that allowed individuals with DEA authorization, prescribers with a particular DEA authorization to prescribe Suboxone specifically to a set number of patients. But the issue, as I understand it, was that approximately five years later, the rule changed and the district judge did not allow you to introduce what happened five years later. Is that where you're going here? That's correct. That is correct, Your Honor. Why was that an abuse of the district judge's discretion in terms of managing the trial? The argument that's been advanced and that we made at that point in attempting to introduce that, that was an initiative that was begun by Dr. McFarland's counsel, was that while that is an administrative regulatory policy that changed officially, in fact was withdrawn in 2022, I believe, by the DEA, the caps were eliminated, that it was a policy change, an administrative policy change. So those things don't happen overnight. So the significance of that in our view was that those policy discussions would have been taking place in the years preceding that. That would have been information that Dr. Harrell would have been... But the conspiracy, as I understand it, and correct me if I'm wrong, ended in 2018. You're correct, Your Honor. So I guess I'm lost as to why this would be reversible error. Yes, I understand, Your Honor. And I think the... I think it's particularly factually specific to this kind of case and this particular case in general, where the evidence advanced by the government was largely circumstantial and a great deal of that was based on these sort of administrative, not necessarily this specific one, but among others, administrative sort of regulations like... Weren't there people who testified as to the exact practices of your client and the other client's co-defendants? As in other providers? It wasn't just circumstantial evidence. It was testimony of exactly what was being done and why it was part of this conspiracy. That is accurate, Your Honor. There was some testimony, for instance, a number of patients identified or testified, individuals who were seen at that clinic by Dr. Harrell and others. All of those individuals testified, frankly, that they were addicts and that as they testified with regard to Dr. Harrell, that he helped them and provided them the medication that they required to treat their addiction. There were other providers who testified, some of whom worked at the clinic, some who did not, and did testify about the practices within the clinic. And those... Much of that testimony talked about things like the color of the files. There was this blue-white file folder issue, the patient caps, how many patients were seen on a day and how many patients they saw that relate back to this data waiver or ex-waiver issue. They testified to how much time they spent in the room with various patients, counseling services that were provided, things they discussed with other colleagues, including Dr. Harrell, who was a medical director and he was an addiction specialist. So there was testimony, you're correct, Your Honor. Many of those things related to these, as opposed to testimony about patient harm or not, for instance, not even seeing a patient and issuing a prescription. That wasn't exactly what was happening here. That wasn't the testimony, but they did testify about patient cap numbers, who scheduled, things like that. So the factual sort of thread that I'm trying to weave back to that data waiver, and it's probably clearer in the briefs than I'm saying it today, is that under the circumstances of this case, where so much of that administrative red flag evidence came in, that Dr. Harrell and the other co-defendants should have been able to address the underlying... The context of those administrative regulations, specifically this data waiver. Because this was something that was hammered throughout the course of the two-month trial, were these patient caps. We saw summary exhibits of the number of patients seen in a day and the number of physicians on site. So can you connect to me the inference you would be trying to get the jury to make if you were able to admit the evidence that many years after the conspiracy ended, that the government, that the DEA, completely eliminated these caps. What were you trying to get the jury to understand about what was happening during the conspiracy time based on this thing that happened five years later? So what we would have attempted to get the jury to understand was that this letter came out in 2022. These policy discussions had been going on in the addiction medicine community for a very, very long time. So you'd be trying to get the jury to infer that what they were doing was authorized or was within the standard of care or was... Bring me through to the inference that you're trying to tell the judge why he had to admit this evidence. What we would be trying to do is show that violating the caps, because it was an ongoing policy choice, was a decision made within the standard of care, but that violation, as the government tried to use it, to show that it was, quote, unauthorized prescribing, which is the required standard of proof, that because those discussions were ongoing, that red flag itself did not per se mean the prescribing itself was unauthorized, that it could still be within the standard of care, even though it violated that administrative policy, and violation of that administrative policy would not necessarily equate to unauthorized prescribing under the statute. Wasn't there substantial other evidence of unauthorized prescribing? There was testimony about... And it may be that I'm just not remembering everything. There was testimony about short period of time spent in exam rooms with certain patients. There was testimony about, in some cases, physicians' names being changed on prescriptions without the physician's knowledge. There were... The owners of the clinic was another physician and his wife. There was some testimony about them doing that. They were not at trial. There was testimony about refills, and there was other testimony about conduct going generally around the clinic that we see in what I think of as more traditional pill mill kind of cases dealing with oxycodone, opiates of that nature, parking lots. So yes, Your Honor, there was some other evidence. Am I correct that you were able to admit evidence that the caps increased during the period of the conspiracy, that they started kind of at a more restricted level, but that the judge did allow you to admit the regulatory changes that happened during the conspiracy itself? Yes, Your Honor. He did allow us to admit the specific... It did climb up, and over a period of your time in medical practice, those sort of caps grew as you spent more time practicing suboxone medicine, and the judge did allow us to admit those increased numbers that occurred over time. Thank you. Thank you, Your Honor. Thank you, Your Honors. Good morning, Your Honors. May it please the Court, my name is Summer McKeever, and I represent Dr. Mark Grinkoski, appellant. In both the opening brief and the reply brief filed on behalf of Dr. Grinkoski, and without waiving any of those issues briefed, we addressed several significant evidentiary issues that occurred during the trial. For brevity and because of the limit on time today, I would like to specifically focus on four of those issues. The primary issues that we have asked the Court to review for abuse of discretion were the admission of testimony by Dr. Rasberry by the Court. Dr. Rasberry was allowed to provide not only irrelevant, but speculative and prejudicial testimony in regards to what he would have done, but for the illegal work he did at EHC. Dr. Rasberry was a physician at EHC who was also practicing addiction medicine, and was seeing patients and prescribing the antidepressant, as mentioned by Ms. Cravens. At the end of his testimony, after being allowed to testify to what he did within the clinic and what he saw, he was asked by the government, would you have written, and this is a direct question, would you have written those illegal prescriptions if not for EHC? At that point, he responded, I would have, no. He was then asked why, and he said, because I would have approached it differently. At that point, the government asked, what do you mean by that, and the defense objected. At sidebar, the objection was very clear that the objection went to the entire line of questioning here. The objections were based on the relevance of the asking of that question and the answer to it, but also on the speculation that would have been required for Dr. Rasberry to answer it. Most importantly, the speculation would have been based on facts that didn't exist. They were counterfactual. We know exactly what Dr. Rasberry did as he was a physician treating addiction medicine in that clinic. There were no change of circumstances other than to put him into a fantasy clinic somewhere else. So the defense counsel objected, and what did the district judge do? The district court allowed it. The district court allowed it. Did you ask for a cautionary instruction or any limiting instruction? Not for that, Your Honor. What was asked for, however, and was given at the end of the testimony was just a cautionary instruction regarding the difference between fact and expert testimony. However, there was no cautionary instruction specifically given on the nature of the objection or the speculation of the answer to the question. And Rasberry was testifying as a lay witness, is that right? He was, Your Honor, but based on the fact that he had also been a physician within the clinic, clearly at the end of his testimony the cautionary instruction was given because he was testifying about things that were happening within the clinic in regards to the practice of medicine. So not only was the question irrelevant, as it did not go to the fact at issue, which was whether or not Dr. Harrell, Dr. Gronkowski in my case, issued the prescriptions without a legitimate medical purpose within the usual course of professional practice, nor whether or not the urine drug screens were medically necessary, the question and the answer had no relevance to begin with. But more importantly, it called for inappropriate and improper speculation that would have not been based on any perception, personal perception by Dr. Rasberry, because in fact Dr. Rasberry's testimony was exactly how he acted. But more importantly, when it was... Can you remind me, how many days was this trial? Two months. Two months. And this is one line of testimony? This is one of several that I'm going to point out to you today. Okay, so is your argument about cumulative error? No, my argument is that each of these could be reversible error on their own, however, if you don't... So stick with that then, how, if Dr. Rasberry couldn't have said, I mean, and yes, maybe how the question was raised was an artful and kind of gets into speculation, but he's saying, I take this to mean a little bit like, in this context of EHC, this was going on, if I hadn't been there, maybe I wouldn't have been doing these things, right? But in the scope of the evidence presented at trial, including many things that co-counsel for one of the co-defendants just explained to us, how would this not have being there swayed the jury to go in a different direction to your client? Because it allowed him to get to answer the ultimate question that's left for the jury. His response to that... I mean, he's just saying for him, I think that the ultimate question that's left for the jury is as to the defendants. He's saying, you know, if I weren't there, what, what his practices might have been different. Except that his answer didn't, except that that wasn't his answer. His answer was that I would follow state and federal law. And in responding to that... Well, his answer was because I approached it differently, right? No, I would not have. And then, and then the question was asked, can you explain that? An objection... And then there was an objection. And then there was discussion at sidebar, and then he was allowed to answer that question. And in response, and once the objection was overruled, he was allowed to answer that question. That allowed him then to say that he would have followed state and federal regulation. Thereby inferring to the jury that they had not been following state and federal regulation and that these prescriptions, which was in the question, but for the illegal prescriptions at EHC. So now you've allowed the state and federal regulation following to infer that, to answer the question of the illegality of the prescriptions, when that is not the standard under the Controlled Substance Act. So I believe that is reversible error in and of itself. But I would like to move on because there was further errors. And that is the undisclosed expert testimony that was allowed by Dr. Zotos. Dr. Zotos was actually a fact witness on the government's list, and he was to testify about an email that he had sent, not to Dr. Grinkoski, but to others in this field. And first of all, we believe that once he began to testify, he became an expert. The original line of questioning was how any defense, or was how any attorney would question an expert in order to qualify them as an expert. What is your background? What is your experience? What is your education? That's how the government began its line of questioning. The government then went into the contents of this email. The contents of this email spoke about many of the red flags that Ms. Craven has just discussed and that the court asked about. So was that email sent to your client? It was not. Was it sent to any of the other defendants? I believe it was sent to Dr. Harrell. But it was not sent to Dr. Grinkoski. There was speculation on whether or not it was forwarded to Dr. Grinkoski and or whether or not he saw it. There was no evidence that he did or responded to it and it certainly was not originally. But if it was sent to Harrell, then it would be relevant to the case, correct? I'm not arguing the relevance. I'm arguing that in allowing him to testify to the email, the contents of the email, he was allowed to go further. He was allowed to then use his training, background, and experience in medicine, and specifically in addiction medicine, to talk about the different areas that were being addressed. Specifically, defining and opining on diversion, charging cash for visits rather than taking insurance, quantity and doses of prescriptions. Could he have testified, could Zotos have testified with respect to his practice on those particular topics? And that is what the district court continued on sidebar. There were multiple objections to this testimony. And on sidebar... Can you answer that question, yes or no? Well the answer is yes, and that's what the district court attempted to do. However, it was already too late because he originally testified to the email and the district court continually warned the government that he needed to only stick to what he did in his practice. So later during his testimony, he did. Did Dr. Zotos stick to what he did in his practice? He did not. So specifically, what did he say that makes him an expert witness here, that makes his evidence so flawed that you should get a new trial? He specifically talked about the fact that patients only need two strips of the buprenorphine, and that if you were to prescribe three strips, which was often done at EHC, and also charging cash, then what you were clearly doing was you were allowing that third strip to be diverted in order for the patient to earn money to then pay for their cash visits at your clinic. That is what he said, and that was what was inferred. And that was not based on what he did at his clinic. That was based on his knowledge and experience within the field of addiction medicine. So he didn't testify that in his clinic, he only used two strips of... He did that subsequently, but it was too late at that point. When referring to his letter and why he had said certain things in his letter, he referred to his medical training and background, and that is why we say that he was an undisclosed expert. But adding insult to injury of that, the cautionary instruction that was given for Dr. Raspberry between the difference between a lay witness or a fact witness and an expert witness was not given after the testimony of Dr. Zotos, even though the district court acknowledged that he numerous times veered into the realm of expert testimony. You or one of the other co-defendants asked for that instruction at the end of the Zotos testimony? Your Honor, it was asked for. I believe the instruction was asked for at the end of Zotos' testimony. I am not 100% on that. I can check the record and come back and rebuttal for that. Thank you. Thank you. Good morning and may it please the Court. Brendan Gantz for the United States. The defendant's convictions should be affirmed. I'll begin with the issue that Dr. Harrell's counsel started with today about the evidence regarding the Congress's elimination of the data waiver requirement in 2023. The District Court pointed out repeatedly throughout trial that the defendants had proffered nothing to show a connection between that 2023 decision by Congress and the timeframe at issue in this conspiracy, which was 2013 to 2018. Nothing to suggest, for example, that violating the data waiver rules during that time period was part of the usual course of professional practice or that any of the defendants somehow anticipated the change that Congress would make five years after this conspiracy ended. Your opponent was arguing that there was a continuum of discussion of the data waiver issue. Is that correct? I don't know of anything in the record to support that. Of course, medical rules and regulations are always being discussed, but I don't know of anything that would suggest that the elimination of the data waiver rules was on the table in 2013 to 2018 or that doctors acted as if they could simply ignore those rules and that was part of the usual course of professional practice. I believe that McFarland's reply brief mentioned some testimony that she gave that in 2015 there was discussion of state rules around buprenorphine, but that would be state rules, not federal. It doesn't have anything to do with the data waiver requirements. In 2015, it was also the timeframe in which Dr. McFarland told law enforcement that she saw practices at EHC that were well beyond the standard of care. She described ridiculous prescribing practices, that EHC was a pill mill, and so nothing about that testimony would suggest that there was any knowledge by any of the defendants within the timeframe of the conspiracy that these rules could be violated or were on the verge of being changed. So would your position on this change if the defendants had proffered testimony, perhaps said, you know, the standard of care is actually to not follow these given caps, would you then feel like it was appropriate, it would have been appropriate for the judge to limit, you know, the fact that this, yeah, indeed, this rule was actually, you know, completely eliminated. Not only did the caps increase over time, which I understand the judge did let in, but yet they got rid of it entirely because it didn't make sense. I think it could have changed the factual picture significantly if within that timeframe of 2013 to 2018, there was evidence along the lines that you described. And the district court said that, that if defendants could proffer a connection, they would be able to introduce evidence along these lines, just as they were able to introduce the evidence that within the timeframe of the conspiracy, these rules were adjusted. But there was nothing proffered along those lines. And I know there's been some suggestion by the defendants that the government's view of buprenorphine has materially changed. I don't really think that's true. Buprenorphine was a Schedule III controlled substance when this conspiracy began. It's a Schedule III controlled substance today in the same category as ketamine. What the prosecutor explained at some point during, at sidebar, and we cite this in our brief, is that the changes in the data waiver rules had less to do with the government's view of buprenorphine and more to do with changing circumstances in addiction treatment. The government's expert during trial referred to the period of 2013 to 2018 as the oxycodone days of addiction treatment. And of course now when we think about addiction treatment, we think more about more dangerous drugs like fentanyl that have increased in prevalence. And so if this evidence had been introduced, then the government would have needed to introduce evidence to show how, between 2018 and 2023 when this change was made, the surge in fentanyl cases changed Congress's cost-benefit analysis and led to the repeal of these rules. But none of that would have been relevant to the timeframe that we're talking about between 2013 and 2018. So without a connection to that timeframe, this evidence doesn't even meet the low bar of 401 relevance. And certainly the district court's weighing of the 403 factors was not an abuse of discretion. Moving on, I also wanted to address a point that Dr. Harrell's counsel made about the patient testimony because there was some suggestion that patients testified that they were given what they needed when they came to EHC. To be clear, there was testimony from multiple patients about the negative effect that EHC's alleged treatment had on their substance abuse problems. John Hubbard, for example, who's referred to in the briefs, testified that his substance abuse problems spiraled out of control while he was at EHC. And so there was evidence from patients as well as from former EHC staff members, law enforcement witnesses, about the harms that these practices caused. Moving on to the issue raised regarding Dr. Raspberry's testimony, as we say in our briefs, I don't think there's any dispute, and it's not disputed in the reply briefs, that the government could elicit testimony from Dr. Raspberry that he practiced the way he did. And by the time he gave the testimony that's challenged here, he had already testified about his pleading guilty to drug trafficking and that his judgment was compromised by the extraordinary patient volume at EHC. But I don't think there's any dispute that Dr. Raspberry could have then testified that he prescribed the way he did because he worked at EHC. To ask him if he would have prescribed differently had he not worked at EHC is logically the equivalent of the same statement. And Dr. Gronkowski has not explained how he was prejudiced by a different framing of the same point. So was Raspberry's pleading guilty totally tied to his work at EHC? Yes, I believe so, Your Honor. He didn't have some other federal crimes here? No, no. This was based on his work at EHC. And we cited the Curley case where this court held that bank employees could testify as to what their banks would have done differently if they had known certain facts. Certainly if a bank employee can testify from personal knowledge about what an institution that he works for would have done in different circumstances, then a person can testify from personal knowledge about what he himself would have done in different circumstances. Sounds totally speculative, what Raspberry says he would have done if he hadn't been at EHC. I don't think so, Your Honor. I think lay witnesses can testify about the facts and give their lay witness opinion, including about matters that they think they know from personal perception. I think it's within the realm of those rules for a witness to say, if circumstances had been different in a particular way, I would have acted differently. And any suggestion that that's impermissibly speculative I think goes to the weight of that testimony rather than its admissibility under this court's precedent. Certainly the bank employees in Curley, for example, could have been questioned on cross-examination about what their basis was for saying that their banks would have operated differently in a different environment. But that under Curley goes to weight rather than the admissibility of this testimony. And again, we don't think that the defendants have really argued why they were prejudiced by a different framing of the same point that Dr. Raspberry prescribed this way because of the fact that he worked at EHC. Moving to the Dr. Zotos issue, I did want to clarify that the email that Dr. Zotos sent, which is really how he came into this case, was sent to Dr. Taylor, who owned EHC, Dr. Harrell, one of the defendants, Dr. Cirelli, who was a fourth defendant who hasn't appealed here, but he was also on trial at the same trial as defendants. So that email was sent to them. There was also discussion at sidebar of the fact that it was forwarded to Gronkowski, but that evidence was never presented to the jury because the witness didn't have foundation to testify to it. And so that email, which discussed Dr. Zotos' grave concerns about the prescribing practices of the careless prescribing practices, as he put it, of some clinics in the region, including charging high cash fees above $200, EHC charged up to $375, including prescribing more than two doses of Suboxone for patients. So why did Zotos send this email? He sent this email to a group of doctors in the area to express his concerns about the rise in diversion in the region. He's sending it just because he's a practicing doctor in the area? Or is he the chairman of some medical group? There was an association of addiction medicine providers that he was a part of, and he sent that email to a lot of the other providers in that network. So that's why he was sending that email. And that included Dr. Harrell and the other EHC physicians that he sent the email to. So the concern that I have is why is he not truly an expert witness? And there was a failure to divulge him as an expert witness, so that would limit the ability to have his testimony. So convince me why you think he's a lay witness. Well, I think it's possible that if the government had attempted to qualify him as an expert witness that he may have qualified for that. But the government didn't do that? The government didn't do that because the government proffered him as a lay witness. Why is he a lay witness as opposed to an expert witness? Because he'll... Oh, sorry. Explaining all of the horrors of the practices of pill mills. Well, I don't think he went into all the horrors of the practices of pill mills. I think his email discussed some concerns that he had about certain practices, and that was evidence, direct evidence that went to the state of mind of the defendants who received that email. But he was a lay witness because he only gave lay testimony. And this court's precedent is clear that even witnesses who have substantial expertise, including doctors, can give lay testimony so long as their testimony is restricted to testimony that a lay witness could give, which can include discussing their own treatment methods so long as they do so using everyday reasoning and observations. But why isn't what he's doing saying what he thinks the standard of care is? And that's something that an expert witness would testify to. So it's one thing for Zotos to say, in my practice, I do X, Y, and Z, and then let the jury infer that because this person who practices medicine does X, Y, and Z, that maybe because these defendants did A, B, and C, they are violating the criminal law here. But where do you draw the line for a doctor between lay and expert witness? Well, I think the line that Your Honor is drawing is just the line that the district court drew. The district court made very clear when he testified on direct examination, he can testify to his email and explain the terms used in the email, and he can testify about what he did in his own practice. But he cannot testify about the general standard of care or the practices of addiction medicine providers. He cannot give an opinion on whether EHC's practices were appropriate or not. And so the district court held to that line throughout his direct and redirect testimony. And it's similar to the testimony that this court approved in Betro. It actually didn't go quite as far as the testimony in Betro because in that case, a defender gave lay witness testimony in which he was comparing his own treatment practices to the treatment practices of the defendants. Here Dr. Zotos did not comment on EHC's treatment practices. He had of course sent this email and he talked about the terms used in his email and why he had the concerns that he expressed in the email. But he didn't comment on broadly the standard of care or usual practices, and he didn't say whether EHC's practices were appropriate. So it's your position then that it's fine for him to say, you know, I routinely prescribe two doses, I don't prescribe three doses. That's completely fine lay testimony. That could be a testimony of, you know, someone, you know, who's not a doctor who says, oh at this clinic I go there and they give me two, they don't give me three. Right. Right? But that's okay coming from a doctor as long as he doesn't say, oh yeah, and in that clinic they gave three, and I think there's something wrong with that. That's right. Even though that might be a necessary or might be a reasonable inference that a juror could draw. It might be a reasonable inference that a juror could draw in the same way that a juror might draw a similar inference from testimony that was presented at trial that is not disputed where for example patients testified about the practices of other addiction treatment clinics that they went to, or people who worked at EHC testified about how other clinics they worked at operated differently. The jury might draw an inference from those statements that the way that EHC was operating. Does it make it an expert? Yeah. Can I ask, when you, when you read this part of the transcript of the trial's transcript and obviously none of us were there, but it, it seems, you know, that the district court is, is trying to really kind of hold a line and it's saying, no, you can't ask that question. You can't ask this question. The government is rephrasing some questions. I hear from your friend on the other side that in some of these areas, things went to too far. And I wonder if you might address some of the specific examples that, that your friend gave in terms of, um, I think that the dosages particularly, I was, I was trying to write them down, but it, but it did, it did seem, I mean, and, and, um, you know, of course, you know, the, the, it did seem like the district court judge was, was kind of threading, threading a needle, so to speak. Yes. I agree, your honor. And, and that gets to the last point I wanted to make on this, which is that if you look at the specific areas where defense counsel has argued that Dr. Zotos' testimony crossed the line into expert testimony, and this is clear in the reply brief footnote one, as well as from some of the arguments that we've heard this morning, I think what's become clear over the course of this briefing in this case is that a lot of what they're relying on is testimony that they elicited on cross-examination. Dr. Zotos was asked on cross-examination by Dr. Gronkowski's counsel over and over again about appropriate drug dosages, essentially probing this notion that giving more than two doses of buprenorphine was inappropriate, even though Dr. Gronkowski himself in his interview with the DEA said giving more than two is inappropriate, but Dr. Zotos was probed repeatedly on cross-examination about circumstances in which it might be appropriate to give more,  and... But are they probing that on cross because they felt like it was already inappropriately or maybe kind of beyond the line given during a direct examination? Well, I think there's just no basis for that argument based on what Dr. Zotos testified on direct examination, that Dr. Zotos did testify about the statements in his email about it being inappropriate to give more than two, and if they wanted to explore his basis for that opinion on cross-examination, the district court allowed them to do that, but this court's precedent is very clear. For example, in United States v. Raymer from 2018, the defendants cannot elicit testimony on cross-examination and then try to get relief on the basis of that very testimony on appeal. That's invited error. So in exploring that subject, they were giving Dr. Zotos an opening and an opportunity to express the basis for his opinions that he otherwise didn't have on direct examination. And even on a redirect examination, when the government asked, well, now that this door has been opened, we need to be able to ask questions along the same lines, the district court made clear, you can ask questions on the same topics on redirect, but it has to be specific to his practices and what he did. And the district court at times sustained objections along those lines, at other times it asked the government to reframe questions, for example, to be about his particular practices rather than giving a broader medical explanation. So I think the district court was very diligent in trying to draw the correct line between expert testimony and lay witness testimony here, and the defendants have not shown any error or abuse of discretion in the district court's drawing of that line, nor have they shown that they were prejudiced by any error along those lines. If the court has questions on any other issues, I'd be happy to answer them, otherwise we will rest on our briefs and ask the court to affirm. Thank you. Thank you, Your Honors. Rebuttal? Your Honors, thank you. There's nothing specifically that the government just stated that I feel I need to respond to that's not already in the briefing, so I will rest on our briefs. Thank you. Thank you, Your Honors. I just do want to touch on a couple of things that the government has stated today in their argument. One, I would like to go back to Rasberry very briefly, but the government has relied on the case Curley, and in that case, they're stating that the bank experts were allowed to opine on what would have happened when given some unknown facts. That's not what happened here with Dr. Rasberry. There were no unknown facts that were presented to Dr. Rasberry and then asked him what he would have done had that occurred. The only different fact here, or if you can call it a different fact, was to put him in a fantasy location, not EAC. That's it. It wasn't like what if, and more importantly, and I think this is interesting, is that Dr. Rasberry never did explain why he would have done things differently. In other words, what caused him to do things one way at EAC versus what he would have speculatively done at this other clinic, other than to say he would have followed state and federal guidelines. Could you have inquired of Rasberry further about that? I think trial counsel could have. Why they would have wanted to open the door even more and let him expound on that, I believe that was a judgment call on trial counsel's part. But it does make it seem like the Rasberry statement is a very limited statement, one line type of thing without much emphasis on it. Sure, and except for the way in which the question was asked and the way in which he was allowed to then bring in the rules and regulations to infer that those were what made a prescription illegitimate, I believe that is where not only the question but the answer crossed over into improper testimony. But I'd like to move on because there's a couple of other things that the government discussed, and I want to focus a little bit again on Dr. Zotos. You know, the thing that's interesting here is that we keep referring to whether Dr. Zotos was comparing his practice to the practice of Dr. Grinkoski. But in determining whether or not a person is an expert for testimonial purposes, it doesn't really matter whether or not they're going to comment on the actual actions of, let's say, the defendant, but whether or not they're drawing on particularized training, education, and scientific background, which is exactly what he was doing here when he issued the email. The thing about that is, while he was asked, what would you prescribe or what did you prescribe, that came later. But the email can't be admitted to just show about the recipient here, a co-defendant's state of mind, they got this warning, what did they do about it, that he would have to be an expert even to be able to admit an email into the record that is used for kind of state of mind here? Well, the problem there is that it takes that email and it makes it the standard of care, right? So you want to say that receiving that email has somehow put Dr. Harrell, Dr. Taylor on notice that what they're doing may be improper, but that's not necessarily true. They can practice medicine the way that they deem proper as long as they issue prescriptions for a legitimate medical purpose within the usual course of professional practice. By allowing this email in and stating it the way it was, he just set the standard of care. Therefore, he's testifying as an expert, because that is what the jury is told that they can compare to to determine whether or not what the defendants were doing was outside of the standard of care and therefore outside the usual course of professional practice. It's that in and of itself that makes this email an undisclosed expert report and the testimony about it undisclosed expert testimony. I would also just briefly like to touch on a couple other things. The government brought up the fact that there was additional testimony and they spoke about John Hubbard, who was a patient who testified about how his addiction got worse or that it increased when he was a patient. He also, and this is also in her briefing, he also brought up the fact, unreally prompted, that two people had died at EHC. At that point, an objection was lodged by defense counsel and everyone took a break and the court came back and said, you know what, I'm going to allow it assuming that those deaths are somehow tied to EHC or the defendants. At that point, the government decided to rest. They asked no further questions. So when the court decided to say this is why I will allow it, but the government sat down, the court at that point should have then said, well, then the objection is sustained. Because no further thing... Did your side ask for that kind of a ruling? Not only did our side ask for that ruling, the side objected to the question or objected to the statement, moved for a mistrial, and in the alternative, asked for a cautionary instruction. And none of that... None of that happened. And at that point, there was a break, there was a lunch break, the court said they would rule when he returned. When he returned during that ruling, he informed the government, I'm going to allow this assuming you can tie these deaths to actual defendants or practices at EHC. At that point, the government's response was, we're done with this, we're going to pass the witness. And then you renewed your request, given that the government didn't make the connection or... The objection was sustaining. That's the problem. There was nothing that happened that required another objection. The judge should have just realized that the government didn't... Exactly. When ruling on it, the judge said, I'm going to allow you this because you're going to tie this to something along the lines of this case. But the government responded immediately and said, we're passing the witness. But the government have tied it through subsequent testimony of other people. Your Honor, that's too late at that point. I mean, they not only... They needed to first ask the individual, we didn't even know the names of the patients. How could they? They didn't even ask any other subsequent questions to determine who those patients were to then later tie those deaths to the defendants. They asked zero questions. They passed the witness. So all that happened at that point were these two deaths were just hanging out there with nothing further to explain them. But more importantly, the exact thing that the court had said it would overrule the objection on and the government informed them was not going to happen should have at that point changed the ruling on the objection. Before you step down, just to bring you back to Dr. Zotos for a second and kind of repeat one of my questions that I asked the government as the district court tried to kind of police this line of testimony. And I think you said, you know, you agreed that Mr. Zotos could testify, you know, just what happened in his practice, right? And the district court trying to police that lines. Are there particular, and I saw you reviewing the records, are there particular lines of testimony that you would like us to go back and look at that went beyond it? Very specifically, anything that he testifies in relation to the email. In relation to the email and what he stated in the email, he explains his scientific and medical reasoning as to why he made that statement in his email. And none of those were tied to his practice. The questions and answers related to his practice came after as the objections started to roll in as the district court continued to try and rein him in. But I would also like to finally point out is that the district court noticed and recognized that he kept veering outside of the lines when testifying to the email. And the problem with that was that the district court was trying to say he can testify to what happens in his own practice, but he was sending this email not as what's happening in his own practice, but what is happening in the medical community because very specifically this email was addressed to members of the Tennessee Society of Addiction Medicine. Okay, I think I understand that you think that email is the kind of big thing that crossed that line. Thank you. Thank you. Thank you. Thank you all for your argument. The case will be submitted.